UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARTEZ D. MATTHEWS,<br><br>Petitioner,<br><br>v.<br><br>RANDY LEE et al.,<br><br>Respondents. | Case No. 3:17-cv-00887<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Luke A. Evans |

To: The Honorable Waverly D. Crenshaw, Jr., District Judge

## REPORT AND RECOMMENDATION

Petitioner Martez D. Matthews (Matthews) has filed an amended petition (Doc. No. 16) for a writ of habeas corpus under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Matthews asserts multiple grounds for relief including evidentiary issues under state law and ineffective assistance of counsel. Respondents argue, in short, that Matthews defaulted procedurally on several of his claims; for the others, he simply has not crossed the threshold of demonstrating a violation of clearly established federal law. Matthews did not file reply papers even after the Court set a deadline to do so. (Doc. No. 37.)

This case has been referred to this Court for a recommended disposition. (Doc. No. 36.) For the reasons below, the Court recommends that the amended petition be denied.

## I. Background

To avoid duplication of effort, the Court will borrow the undisputed background summary from the state appellate opinion addressing Matthews's direct appeal:

> This case involves the shooting death of the victim, a sixteen-year old female, L.J. During a shoot-out that occurred on the street outside her home, the victim was struck by a stray bullet when it entered her home. A Davidson County grand jury indicted appellants and their co-defendant, Lorenzo Ortego Thomas, II,

for one count of first degree felony murder and one count of employing a firearm during the commission of a dangerous felony. Codefendant Thomas's case was severed from appellants' case, and the trial court conducted their joint trial from May 9–12, 2011.

Inez Johnson, the victim's mother, testified that around 4:00 p.m. on April 25, 2009, she and the victim were at their home on Chesapeak Drive. They were lying down in Ms. Johnson's bedroom when they heard gunshots. Ms. Johnson stated that she "instinctively . . . dropped and rolled." She further stated that "instead of laying low and rolling from the bed, [the victim] raised her body up" and was struck by a bullet. The victim began bleeding from her mouth. Ms. Johnson called 9–1–1 and rendered aid to the victim in an attempt to stop the bleeding. She said that she could not tell from where the victim was bleeding. She recalled, "[B]lood was just everywhere, . . . and I was right there beside her[,] and I knew [she] wasn't going to make it[,] and I watched her take her last breath . . . ."

Christopher Cote, a detective with the Metro Nashville Police Department ("MNPD"), testified that around 4:00 p.m. on April 25, 2009, he responded to a call at 3652 Chesapeak Drive. The paramedics were already at the scene when he arrived. Officer Cote was advised that a sixteen-year-old female had been shot. He entered the home and observed the victim lying on the floor, bleeding profusely. The paramedics transported the victim to the hospital, and additional police officers arrived at the scene. Officer Cote stated that he secured the scene and advised his superior officers and investigators as to what had occurred.

Officer Cote recalled that Officer Brian Eaves arrived at the scene. He stated that a witness approached Officer Eaves and gave him a hat that the witness had found. He placed the hat, which the witness found in the street to the right of the victim's house, in an evidence bag and gave it to the crime scene investigators. Officer Cote stated that he also found multiple shell casings of different calibers at the scene.

Lynne Mace, a crime scene investigator with the MNPD, testified that she investigated the scene in this case. She drew a diagram of the scene, which she described for the jury. The diagram depicted the locations of bullet cartridge casings. Investigator Mace also photographed and collected the cartridge casings. Investigator Mace recalled that there were two .45 caliber automatic casings and six 9mm casings. She identified photographs that she had taken of the crime scene, including a photograph of the strike mark of the bullet that entered the victim's house.

Christopher Bridges testified that he lived at 3648 Chesapeak Drive. He stated that on April 25, 2009, at approximately 4:00 p.m., he was walking down Chesapeak Drive with Deandre Williams. As they were walking, a car with four or five people inside of it pulled up and began shooting. Christopher began to run, but he heard more than five shots fired. The State showed him a photograph of a vehicle and asked if it was the vehicle he observed on April 25, 2009, to which Christopher

responded, "Yes, sir." Christopher stated that he was given the opportunity to speak with the police about what he observed, but he told them that he "really didn't see anybody, didn't see anything." He said that he did not want to speak with the police and that they forced him to go to the precinct. Christopher admitted that in April 2009, he was a member of the 107 Underground Crips but denied that he was still a member.

On cross-examination, Christopher testified that he did not know why someone would want to shoot at him. He stated that the shooting came from the driver's side of the vehicle. He did not know appellants and said that the first time he saw them was on the news. Christopher stated that he had an adequate opportunity to view the car because it passed him and made a u-turn. He said that the vehicle's license plate was in the window and that the vehicle's bumper was not damaged. Christopher later testified that the vehicle that he identified in the photograph had damage on its bumper. Christopher said that he ran between some houses when the people in the vehicle started shooting; however, the victim's house was not one of them.

Deandre Williams testified that he lived with Christopher and Christopher's family in April 2009. On April 25, 2009, he was walking to a friend's house with Christopher when he heard gunshots. He ran away and was unable to see from where the gunshots originated. He stated that he was sending text messages on his cellular telephone and did not observe any nearby vehicles or people. However, he recalled telling the police that he saw a small blue or green vehicle that looked like a Honda. He explained that he saw the vehicle before he and Christopher began walking. Mr. Williams further testified that he heard more than five gunshots. He estimated that he was three houses away from 3652 Chesapeak Drive when the gunshots began. He ran in the opposite direction from the victim's house.

Mr. Williams denied being a member of or affiliated with the 107 Underground Crips. He stated that he did not know whether Christopher was a member of the gang and denied noticing a tattoo of a gun with the numbers "107" on Christopher's hand.

On cross-examination, Mr. Williams testified that he did not know appellants and had never seen them before the day of trial. Mr. Williams did not know why anyone would shoot at him. He stated that he did not know anything about the incident and was only testifying because the State forced him to do so.

Evan Bridges testified that he is the grandfather of Christopher Bridges and that they lived at 3648 Chesapeak Drive. At around 4:00 p.m. on April 25, 2009, Evan was outside in the backyard of his home. He heard gunshots and went toward his front yard. When he arrived at the front yard, Evan determined that the gunshots were coming from a small green car that was driving down the street. When shown a photograph of a vehicle, Evan stated that the vehicle in the photograph was the same size, but the car he saw on the day of the shooting looked like a Honda. He

observed the heads of three African–Americans in the vehicle and stated that the people in the vehicle were "some young guys."

Evan recalled speaking with three or four police officers, but he denied telling Officer Eaves that he saw two of the three people in the vehicle shooting into 3652 Chesapeak Drive. Approximately fifteen to twenty minutes after the shooting ceased, Evan found a black cap in the middle of the street that was not there before the shooting. He thought that it might have belonged to one of the shooters, so he gave it to the police.

On cross-examination, Evan testified that he did not actually see anyone shoot a weapon. He clarified that the vehicle he saw was green and that the vehicle in the photograph looked like it was blue. Evan stated that he did not see the black cap fall from the vehicle from which the shots were fired.

Quontez Caldwell testified that appellant Moody and Ortego Thomas are his halfbrothers through their father, but he only became acquainted with them a short time prior to this incident. Mr. Caldwell stated that on April 25, 2009, appellant Moody and Mr. Thomas picked him up from his grandmother's house in appellant Moody's vehicle. He identified appellant Moody's vehicle from an exhibit photograph. In addition to his half-brothers, two other males whom he did not know were in the vehicle. He identified appellant Matthews in the courtroom as one of the other passengers in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, the people in the car saw "somebody they had a beef with [sic][,] and they shot at them." He recalled that Mr. Thomas said, "'There go [sic] somebody we beefin' with [sic].'" The driver then turned the vehicle around and drove back up Chesapeak Drive. He said that appellants and Mr. Thomas began shooting at a person he knew as "C. Trigger." Mr. Caldwell did not recall having previously testified that appellant Matthews had a 9mm pistol, that appellant Moody had a ".45 or .40," or that Mr. Thomas had a "38 revolver," but he acknowledged that if he had previously so testified, then it was the truth. He stated that neither he nor the driver had a weapon that day. After the shooting, the men dropped Mr. Caldwell off in the middle of the street. He said that he did not speak with appellants about the shooting after it happened.

Mr. Caldwell stated that the police attempted to interview him. The first two times they attempted to speak with him, he told them that he did not know anything about what happened because he just "didn't want to tell them nothing [sic]." Mr. Caldwell denied being a member of the Hoover Deuce Crips. He denied testifying to being a member in July 2009 and said that if his being a member of the Crips was reflected in his statement, it was not the truth.

On cross-examination, Mr. Caldwell denied that a detective with MNPD brought him in for questioning because he had received information that Mr. Caldwell had claimed that he killed the victim. He further denied getting a new "teardrop tattoo" on his face. Mr. Caldwell did not recall telling the detective that he was anywhere near Chesapeak Drive, that he was with someone named "T.O.,"

that he was in a Chevrolet Impala, or that he did not know the color of the Impala. He stated that he did not know appellant Moody's real name and that he only knew his father by the name "Tango."

Mr. Caldwell admitted that he spoke with another detective a few weeks later but denied that he changed his story about being in an Impala with T.O. Mr. Caldwell admitted that appellant Moody picked him up and then proceeded to pick up another person, at which time the other person began driving the vehicle. He remembered seeing "C. Trigger" and stated that "guns were pulled[,] and they started shooting." In a subsequent interview with Kathy Morante, an assistant district attorney, Mr. Caldwell denied any knowledge of his brothers' having problems with "C. Trigger" and stated, "I didn't know they had no [sic] beef with him." He testified that his problem with "C. Trigger" was "[s]omething about . . . some child issues" and that it was not significant. Mr. Caldwell denied that the "child issues" concerned his child's mother and could not remember stating that there was bad blood between him and "C. Trigger" or indicating that "C. Trigger" had tried to do him harm in the past. He declined the opportunity to review the transcript of his statement.

Kathy Morante, an assistant district attorney in Nashville, testified that in April 2009, she was assigned to handle juvenile transfers for the office. In the course of her work, Ms. Morante explained that it was fairly common to have witnesses testify for the State who had charges pending against them, as was the case with Quontez Caldwell. She further explained that a cooperating witness in this situation was sometimes given "use immunity." "Use immunity," she testified, was an agreement between the witness, his or her attorney, and the State that provided, "[I]f you sit down and talk with us, we're not going to use anything you say during this period of time that we're talking against you to prosecute you so long as you tell the truth." She added, "[W]e specifically reserve the right to use any other evidence that we can come up with against that person, or as I said earlier, if we determine that [the] person is being untruthful, then we can prosecute them." Mr. Caldwell's use immunity agreement form was entered as an exhibit at trial. Ms. Morante stated that the most serious charge Mr. Caldwell faced in the summer of 2009, when he was fifteen years of age, was an attempted homicide that was unrelated to the instant case. He was taken into custody on June 12, 2009, and in November 2009, he entered a guilty plea to aggravated assault and vandalism and was committed to a secure facility of the Department of Children's Services ("DCS"). Ms. Morante noted that Mr. Caldwell also had an unresolved robbery charge. She explained that DCS determines the appropriate time to "step him down from one facility to another and . . . to release him back into the community."

On cross-examination, Ms. Morante testified that Mr. Caldwell had just been released from DCS when this incident occurred. She met with Detective Jackson and believed that Mr. Caldwell could have some information pertinent to the case, but she did not know whether he was involved. On redirect examination, Ms. Morante clarified that the attempted homicide charge for Mr. Caldwell was wholly unrelated to this incident.

Detective Gene Davis of the MNPD testified that on May 15, 2009, he conducted a traffic stop in the area of Nolensville Road for a traffic ordinance violation. He observed three people inside the vehicle he stopped, and during a search of the vehicle, he found a loaded 9mm Glock semi-automatic pistol. Detective Davis stated that appellant Matthews claimed ownership of the weapon, at which time he was taken into custody. Detective Davis identified the weapon, which was entered as an exhibit. He also identified appellant Matthews, who was seated in the courtroom.

Detective Cody O'Quinn of the MNPD testified that he was involved in serving a search warrant for a vehicle located at 314 Kern Drive on June 18, 2009. The vehicle was a green 1999 Kia. He determined that the vehicle was registered to appellant Deangelo Moody and his mother. He identified the temporary drive-out tag found inside the automobile and noted that it would have been valid on the date of this incident, April 25, 2009. On cross-examination, Detective O'Quinn stated that the Kia automobile in the exhibit photograph appeared green in color to him.

Detective Lawrence Brown, also from the MNPD, testified that he obtained buccal swabs from both appellants on February 9, 2011, at the prosecutor's request. He explained that a buccal swab is used to obtain liquid evidence, usually saliva, from an individual. The swabs were packaged and taken to the Tennessee Bureau of Investigation ("TBI") to be analyzed for DNA comparison.

Agent Mark Dunlap of the TBI Crime Laboratory was accepted by the trial court as an expert in forensic chemistry and serology. He testified with regard to his DNA analysis of a black cap. From his testing, he determined that the "DNA profile from the cap was a mixture of genetic material from two individuals." From the standards submitted in February 2011, ten of the thirteen testing sites indicated that the major contributor of DNA on the cap was appellant Matthews.

On cross-examination, Agent Dunlap explained that three of the thirteen testing sites were inconclusive, stating, "[T]here just wasn't enough DNA there to obtain a full profile, so those sites didn't yield results. It doesn't mean that they didn't match, it just means there was no result at those sites." He acknowledged that no DNA belonging to appellant Deangelo Moody was found on the hat.

Agent Robert Daniel Royse of the TBI Crime Laboratory was accepted by the trial court as an expert in firearms and tool mark identification. He explained the operation of the Glock 9mm Luger semiautomatic pistol, the parts of a live cartridge, and the firing cycle process. Agent Royse testified that in his work, he examines the unique set of markings found on every firearm, which can be thought of as a mechanical fingerprint. In making an identification, he test fires the weapon and takes the test bullets and cartridge cases and compares them to the evidence. If the unique characteristics are present on both the evidence and the test material, he concludes that they have a common origin and that they were fired from the same weapon. Agent Royse was provided six spent .45 caliber automatic cartridge

casings and two 9mm cartridge casings in April 2009, and in January 2011, he was provided a 9mm weapon for analysis. He testified that the two 9mm casings provided to him were fired from the weapon he received in January 2011.

Chief Medical Examiner Dr. Amy McMaster testified that a former colleague had performed the victim's autopsy but that she had reviewed and agreed with the report that was prepared. She illustrated the bullet entry wound and the path of travel through the victim's body. She identified the projectile recovered from the victim's body and described the procedure in preserving it as evidence. Dr. McMaster stated that the bullet injured the aorta, the trachea, and both lungs and that even immediate medical intervention could not have saved the victim's life. In summary, Dr. McMaster testified that the cause of the victim's death was a gunshot wound to the torso and that the manner of death was a homicide. At the close of Dr. McMaster's testimony, the State rested its case-in-chief.

The defense called William Jackson, a former officer with the MNPD, who testified that he was the lead detective in the investigation of the victim's death. He arrived at the scene approximately five to ten minutes after receiving the call and remained there for approximately three and one-half hours. His duties included making sure the officers secured the crime scene for purposes of investigating and collecting evidence. Detective Jackson was present during the victim's autopsy and collected the bullet recovered from the victim's body as evidence. He recalled testifying at appellants' detention hearing that the recovered bullet was a large fragment and stated, "I didn't know at the time if it was a[.]45 or a[.]40[.] I guessed that it was one of those too big to be a[.]38 or a[.]22."

Detective Jackson testified at length concerning his three interviews with Quontez Caldwell. He recalled that his first interview with Mr. Caldwell was at the end of April and the second interview was on June 12th. He explained that he uses conversation as his interviewing technique to get to the truth. He would not make promises of assisting in getting charges dismissed or lowered, but he acknowledged that he would "talk for someone if they cooperate" and admitted that "[he did not] know how the [District Attorney] works."

On cross-examination, Detective Jackson recalled that during the first interview with Mr. Caldwell on April 30, 2009, Mr. Caldwell denied being at the scene or having anything to do with this incident. During the second interview on June 12, 2009, Mr. Caldwell began to cooperate and identified appellant Matthews in a photograph array as one of the individuals involved in this shooting. Detective Jackson testified that ultimately, Mr. Caldwell provided seating positions in the vehicle and stated that appellants were two of the three people involved in shooting at Christopher Bridges and Deandre Williams on April 25, 2009.

Upon this evidence, the jury convicted both appellants of first degree felony murder committed during an attempted first degree murder, and the trial court imposed life sentences.

*State v. Moody*, No. M2011-01930-CCA-R3CD, 2013 WL 1932718, at *1–6 (Tenn. Crim. App. May 9, 2013) (the Direct Appeal). Matthews sought post-conviction relief; following a hearing, post-conviction relief was granted, but the grant was reversed on appeal. *Moody v. State*, No. M201502424CCAR3PC, 2017 WL 829820, at *8 (Tenn. Crim. App. Mar. 2, 2017) (the Post-Conviction Appeal).

Matthews filed his amended petition on November 14, 2023. The amended petition contains 10 different claims, and the Court will address each claim separately below.

## II. Discussion

### A. Habeas Corpus Relief Generally

Matthews cannot receive habeas corpus relief unless he shows that his adjudications in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A decision is contrary to clearly established law if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases." *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (internal quotation and editorial marks and citation omitted).

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)). The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The statute enforces the principle "that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (internal quotation marks and citation omitted).

The AEDPA also imposes a "total exhaustion requirement." *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (citation omitted). Consequently, "[a] state prisoner is generally barred from

obtaining federal habeas relief unless the prisoner has properly presented his or her claims through one complete round of the State's established appellate review process." *Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (internal quotation marks and citation omitted). A petitioner incarcerated in Tennessee exhausts all available state remedies under the AEDPA once the Tennessee Court of Criminal Appeals denies a claim of error. Tenn. Sup. Ct. R. 39, *quoted in Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003).

Procedural default is another issue sometimes intertwined with exhaustion issues. Under this doctrine, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (citations omitted). "We therefore require a prisoner to demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim. The one exception to that rule, not at issue here, is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citations omitted).

**B. Claim One**

In Claim One, Matthews asserts that the State failed to prove that he had the intent necessary to satisfy the predicate for his murder conviction. (Doc. No. 16 at 5.) Matthews asserts specifically that two 9mm casings found at the crime scene and admitted as evidence offered no insight as to the shooter's intent. (*Id.*) On direct appeal, Matthews' theory as to why the evidence was insufficient focused solely on the State's purported reliance on hearsay testimony to establish Matthews' intent. (Doc. No. 27-10.) Matthews thus has not satisfied the exhaustion requirement that "the same claim under the same theory be presented to the state courts before raising it in a federal habeas petition." *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009) (citations omitted);

*accord Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (citations omitted). Alternatively, the state court on direct appeal did review and reject an argument from Matthews about sufficiency of the evidence. The recitation of evidence supporting the jury verdict included the 9mm casings that Matthews mentions here. Direct Appeal, 2013 WL 1932718, at *9. Even if the Court construed the recitation of evidence as an indirect consideration of Claim One on the merits, *see Melchior v. Jago*, 723 F.2d 486, 491 (6th Cir. 1983); *Vela v. Estelle*, 708 F.2d 954, 960 (5th Cir. 1983), Matthews has not done enough to demonstrate a violation of clearly established federal law or to overcome the presumption of correctness of the state court's factual review. *Cf. Gardner v. Sexton*, No. 3:14-CV-0848, 2014 WL 3844779, at *6 (M.D. Tenn. Aug. 5, 2014) (denying habeas petition where, *inter alia*, "there was ample evidence to support the jury's finding in this case that the killing occurred during the attempt to perpetrate the first degree murder" of the targeted victim); *see also Smith v. Nagy*, 962 F.3d 192, 205 (6th Cir. 2020) (affirming denial of habeas relief where, *inter alia*, "a court evaluating a claim of insufficient evidence is not at liberty to reweigh the evidence or reassess the credibility of witnesses"). Matthews thus is not entitled to relief on Claim One.

**C. Claim Two**

In Claim Two, Matthews implicitly refers to *Bruton v. United States*, 391 U.S. 123 (1968), when he asserts that his Sixth Amendment confrontation rights were violated upon the admission into evidence of a statement from a codefendant that implicated his guilt. (Doc. No. 16 at 7.) The state court acknowledged *Bruton* but found, on state evidentiary grounds, that the statement was not hearsay because it was offered only "for its effect on the listener(s), who turned the vehicle around, brandished their weapons, and began firing" their weapons. Direct Appeal, 2013 WL 1932718, at *10. Matthews has not done enough to overcome the presumption of correctness of any state court factual ruling on this issue, and he has not shown that the use of the statement for

nonhearsay purposes violated any clearly established federal law. *See Tennessee v. Street*, 471 U.S. 409, 414 (1985) (citations omitted); *accord Adams v. Holland*, 168 F. App'x 17, 19 (6th Cir. 2005) (unpublished opinion) (citations omitted). Matthews thus is not entitled to relief on Claim Two.

**D. Claim Three**

In Claim Three, Matthews asserts that the admission at trial of an audiotaped statement referring to him as a "homeboy" and "homie" prejudiced him because the terms sounded "gang related to the jury and should not have been allowed." (Doc. No. 16 at 8.) The state appellate court deemed the argument waived under state procedural rules but reached the merits anyway "to facilitate any further appellate review." Direct Appeal, 2013 WL 1932718, at *11. On the merits, the state court found that the trial court did not abuse its discretion in denying Matthews's motion in limine on this issue; there was no testimony that the terms in question were commonly used or signified gang affiliation. *Id.* Matthews has not done enough to overcome the presumption of correctness of any state court factual ruling on this issue, and he has not shown that the admission violated any clearly established federal law. *Cf. Aguilar v. Adams*, No. CV 07-7747-ODW (PLA), 2009 WL 3394461, at *12 (C.D. Cal. Oct. 14, 2009) (denying habeas relief where the totality of ballistics and other evidence rendered any error harmless concerning statements about gang affiliation). Matthews thus is not entitled to relief on Claim Three.

**E. Claim Four**

In Claim Four, Matthews asserts that "[w]itnesses were asked about their gang involvement in front of the jury and even the limiting instruction given to them cannot remove the taint and it was highly prejudicial against the petitioner. The State used the witnesses' gang involvement to suggest there may be a gang related motive in the shooting when there was no evidence of that." (Doc. No. 16 at 10.) The trial court denied a motion in limine on this issue and then permitted two prosecution witnesses to answer questions about gang affiliation. One witness denied any

affiliation while the other claim claimed a prior affiliation that ended. The trial court allowed the evidence for the limited purpose of explaining why witnesses were reluctant to cooperate; to the extent that the testimony had any chance of affecting the credibility of Matthews as opposed to the credibility of the witnesses themselves, the trial court instructed the jury to consider the testimony only for its effect on a willingness to cooperate with law enforcement. The state appellate court found no error in how the trial court managed the testimony. Direct Appeal, 2013 WL 1932718, at *12. Matthews has not done enough to overcome the presumption of correctness of any state court factual ruling on this issue, and he has not shown that the admission violated any clearly established federal law. *Cf. Garcia v. Runnels*, No. CVF036320, 2006 WL 1084636, at *3 (E.D. Cal. Apr. 25, 2006) (denying habeas relief where, *inter alia*, testimony about gang affiliation was limited but "highly probative in explaining why defendant would talk to a stranger in jail about the killing he was accused of committing"), *report and recommendation adopted*, No. CVF03 6320OWW WMW HC, 2006 WL 2734264 (E.D. Cal. Sept. 25, 2006). Matthews thus is not entitled to relief on Claim Four.

**F. Claim Five**

In Claim Five, Matthews asserts that "[t]he trial court erred in permitting the State to play an audio-taped recording of witness Quontez Caldwell in which he referenced a disagreement between himself and witness Chris Bridges. The audio prejudiced the petitioner because it infers that the petitioner also had a prior beef with the witness." (Doc. No. 16 at 12.) The trial court denied a motion in limine on this issue. The state appellate court found that the audiotape evidence was cumulative of the same witness's live testimony and that "the evidence of the relationship between Mr. Bridges and Mr. Caldwell was relevant to establish motive, in that Mr. Caldwell had an ongoing disagreement with Mr. Bridges about the parentage of a child." Direct Appeal, 2013 WL 1932718, at *12. Matthews has not done enough to overcome the presumption of correctness

of any state court factual ruling on this issue, and he has not shown that the admission violated any clearly established federal law. *Cf. Ray v. Kernan*, 646 F. Supp. 2d 1102, 1126 (N.D. Cal. 2009) (denying habeas relief where, *inter alia*, statements about relationship between petitioner and murder victim were probative of motive). Matthews thus is not entitled to relief on Claim Five.

**G. Claim Six**

In Claim Six, Matthews asserts that "[t]he trial Court prejudiced the petitioner by showing a photo of blood because it had no significance other than to shock the jury." (Doc. No. 16 at 12.) The state appellate court found no abuse of discretion by the trial court because 1) the photograph in question was relevant to testimony from the victim's mother about how she tried to stop her daughter's bleeding; and 2) the victim's body was not visible in the photograph, which lessened the risk of a prejudicial effect on the jury. Direct Appeal, 2013 WL 1932718, at *13. Claim Six is a state-court evidentiary issue. Matthews has not done enough to overcome the presumption of correctness of any state court factual ruling on this issue, and he has not shown that the admission violated any clearly established federal law. Matthews thus is not entitled to relief on Claim Six.

**H. Claim Seven**

In Claim Seven, Matthews asserts that "[t]he court prejudiced petitioner by allowing evidence of his conviction of handgun possession." (Doc. No. 16 at 12.) The state appellate court found that the probative value of the evidence was not outweighed by the danger of unfair prejudice because 1) testing of the weapon in question confirmed that it was the murder weapon; and 2) "Matthews's possession of the murder weapon less than one month after the victim was killed was relevant to establish his identity as one of the perpetrators of the crime." Direct Appeal, 2013 WL 1932718, at *14 (citation omitted). Claim Seven is a state-court evidentiary issue. Matthews has not done enough to overcome the presumption of correctness of any state court factual ruling on

this issue, and he has not shown that the admission violated any clearly established federal law. Matthews thus is not entitled to relief on Claim Seven.

**I. Claim Eight**

In Claim Eight, Matthews asserts ineffective assistance of counsel for failure to investigate a codefendant's statement that Matthews was innocent; failure to raise an Eighth Amendment violation regarding sentencing; failure to investigate a self-defense theory; and failure to explain the felony murder statute adequately. (Doc. No. 16 at 12.) The post-conviction appellate court reversed a grant of relief because 1) the proposed testimony about innocence mirrored evidence that the jury heard and accepted when acquitting Matthews of a weapon charge; and 2) all of the other evidence at trial, "the fact that the State prosecuted the petitioner under a theory of criminal responsibility and the fact that Mr. Thomas' testimony would have been impeached support a finding that there was no reasonable probability that the result of the trial would have been different had Mr. Thomas testified." Post-Conviction Appeal, 2017 WL 829820, at *10.

For an ineffective-assistance claim, the clearly established law in play is *Strickland v. Washington*, 466 U.S. 668 (1984), and Supreme Court cases interpreting it. Under *Strickland*, a petitioner must satisfy two elements. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances," 466 U.S. at 688, and "counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks and citation omitted). "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair

trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt . . . . In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result." *Thornell v. Jones*, 602 U.S. 154, 163 (2024) (internal quotation marks and citation omitted). "If [a court] can more easily dispose of an ineffective-assistance-of-counsel claim for lack of prejudice, [it] need not consider counsel's alleged deficiencies in performance." *Winborn v. United States*, 602 F. App'x 298, 301 (6th Cir. 2015) (unpublished opinion) (citing *Ross v. United States*, 339 F.3d 483, 492 (6th Cir.2003)); *accord Henderson v. Cook*, No. 4:20-CV-283, 2024 WL 4354813, at *9 (N.D. Ohio Sept. 30, 2024).

Here, the totality of the trial record supports the conclusion of the post-conviction appellate court that "even if counsel had been aware that Mr. Thomas wanted to testify, his proposed testimony that the petitioner was unaware of what was going to happen would have likely been inadmissible as speculation. Thus, only Mr. Thomas' proposed testimony that the petitioner did not fire a weapon would have been admissible. Therefore, it would have been reasonable not to call Mr. Thomas as a witness because his testimony would have added little value to the case and been subject to impeachment based on Mr. Thomas' multiple prior statements to police." Post-Conviction Appeal, 2017 WL 829820, at *10. The totality of the trial record further supports the finding that any errors by trial counsel were harmless. In the absence of a sufficiently serious error by counsel, and in the absence of prejudice, Matthews is not entitled to relief on Claim Eight.


Case 3:17-cv-00887 Document 38 Filed 08/27/26 Page 15 of 17 PageID #: 2013

### J. Claim Nine

In Claim Nine, Matthews asserts error in the denial of post-conviction relief based on newly discovered evidence in the form of a codefendant's statement that Matthews was innocent. (Doc. No. 16 at 12.) Claim Nine substantially overlaps with Claim Eight and fails for the same substantive reasons—the proposed testimony about innocence mirrored the jury's verdict that Matthews was not a shooter and would not have overcome the weight of the rest of the trial record. Matthews has not done enough to overcome the presumption of correctness of any state court factual ruling on this issue, and he has not shown that the admission violated any clearly established federal law. Matthews thus is not entitled to relief on Claim Nine.

### K. Claim Ten

Finally, Matthews asserts actual innocence in Claim Ten because he "has testimony of witnesses and co-defendant that he was not shooting and even tried to stop the guy from shooting." (Doc. No. 16 at 12.) To the extent that Claim Ten is just a restatement of issues raised in the first nine claims, it fails for the reasons stated above. To the extent that Matthews intended Claim Ten as an independent ground for federal habeas relief, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (citation omitted); *accord Hubbard v. Rewerts*, 98 F.4th 736, 743 (6th Cir. 2024) ("Actual innocence, in this sense [of excusing procedural barriers], operates as a 'gateway' by which a petitioner may belatedly file other constitutional and federally cognizable claims."), *cert. denied sub nom. Hubbard v. Tanner*, 145 S. Ct. 1201 (2025). Matthews thus is not entitled to relief on Claim Ten.

## III. Recommendation

For all of the foregoing reasons, the Court respectfully recommends denying Matthews's amended petition (Doc. No. 16).

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 27th day of August, 2026.

LUKE A. EVANS
United States Magistrate Judge